**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:18-cv-00619** |
| | ) | |
| **JITESH THAKKAR AND** | ) | |
| **EDGE FINANCIAL TECHNOLOGIES, INC.,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |
| | ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND**
**OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

**I.      SUMMARY**

1.      From at least January 30, 2013 through October 30, 2013, Trader A engaged in "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution), and employed a manipulative and deceptive scheme, involving the E-mini S&P 500 futures near month contract ("E-mini S&P") listed on the Chicago Mercantile Exchange, Inc. ("CME"). As part of this scheme, Trader A used a custom trading software application that contained a function called "Back of Book." This Back-of-Book function helped Trader A place orders that he intended to cancel before execution ("Spoof Orders") by minimizing the chance that these Spoof Orders would result in executed trades before Trader A could cancel them.

2.      Defendant Jitesh Thakkar ("Thakkar"), a computer programmer, and his company, Edge Financial Technologies, Inc. ("Edge"), designed and developed the custom trading software application for Trader A, including the Back-of-Book function beginning in fall

of 2011 and continuing through 2015 (the "Relevant Period"). Thakkar and Edge designed the Back-of-Book function with two features that were designed to help Trader A place Spoof Orders. First, the Back-of-Book function continually modified Trader A's Spoof Orders so that these Spoof Orders remained at the back of the order queue at each price level on the CME Globex trading system ("Globex"), where they were less likely to be executed. Second, the Back-of-Book function automatically cancelled Trader A's entire Spoof Order as soon as any portion of his Spoof Order was hit or lifted by another market participant. Using the Back-of-Book function, Trader A was able to place large Spoof Orders, often at or near the best bid or offer, that injected false information about supply and demand for the E-mini S&P and tricked other market participants into trading based on Trader A's spoofing.

3.      When Thakkar and Edge designed the Back-of-Book function for Trader A, they understood that Trader A would use the Back-of-Book function to engage in spoofing and inject false information into the market about supply and demand for the E-mini S&P.

4.      By designing the Back-of-Book function with the intent to help Trader A engage in spoofing, Thakkar and Edge aided and abetted Trader A's spoofing and his manipulative and deceptive scheme. Thakkar and Edge are thus responsible as if they were principals under Section 13(a) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 13c(a) (2012), for Trader A's violations of Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a), 9(1), (3) (2012), and Commission Regulation ("Regulation")180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

5.      The CFTC brings this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), to enjoin Thakkar's and Edge's unlawful acts and practices and to compel their compliance with the Act and Regulation. In addition, the CFTC seeks civil monetary penalties and such other equitable relief as this Court deems necessary or appropriate.

## II.    JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012)

(federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts

have original jurisdiction over civil actions commenced by the United States or by any agency

expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a)

(2012), authorizes the CFTC to seek injunctive relief in any proper district court of the United

States against any person whenever it shall appear to the CFTC that such person has engaged, is

engaging, or is about to engage in any act or practice constituting a violation of any provision of

the Act or any rule, regulation, or order thereunder.

7.      Venue properly lies in this Court pursuant to Section 6c(c) of the Act, 7 U.S.C.

§ 13a-1(e) (2012), because Thakkar and Edge reside in this District, transact business in this

District, and have engaged in the acts and practices that violate the Act within this District.

## III.    PARTIES

8.      Plaintiff **Commodity Futures Trading Commission** is the independent federal

regulatory agency charged by Congress with the administration and enforcement of the Act and

the rules, regulations, and orders thereunder.  The CFTC is headquartered at Three Lafayette

Centre, 1155 21st Street NW, Washington, DC 20581.

9.      Defendant **Jitesh Thakkar** is a computer programmer who resides in Illinois and

is the founder and president of Edge.  Thakkar describes himself as Edge's Chief Architect.

Thakkar has over eighteen years of experience in designing and developing custom trading

software applications for the trading industry, including algorithmic trading systems, custom

order types for electronic trading, and electronic trading regulatory compliance systems.

Thakkar conducts his business developing electronic trading software and tools through Edge.

Thakkar served on the CFTC's Technology Advisory Committee's subcommittee on High Frequency Trading from 2012 to 2014. Thakkar has never been registered with the CFTC.

10.     Defendant **Edge Financial Technologies, Inc.** is an Illinois corporation that Thakkar founded in 2007. Thakkar is the president, secretary, and registered agent of Edge. Edge employs up to four software developers who help design and develop electronic trading software and tools at Thakkar's direction and supervision. Edge has never been registered with the CFTC.

## IV.     FACTS

### A.     The E-mini S&P Market

11.     The E-mini S&P is traded on CME, a registered entity. Trading in the E-mini S&P is conducted electronically via Globex. On Globex, traders have the ability to enter, modify, and cancel orders in a matter of milliseconds through a computer portal that accesses the Globex platform.

12.     An "order," in the context of electronic exchange trading, is a request submitted to an exchange to buy ("bid") or sell ("offer" or "ask") a certain number of a specified futures contract. An order is for one or more contracts. Contracts may also be called "lots," among other things. When an order to "buy" or "sell" futures contracts is placed on Globex, the order becomes part of the exchange's order book. When one or more contracts in an order are bought or sold, the result is an executed trade. A buy order or bid that results in an executed trade is said to be "hit." A sell order or offer that results in an executed trade is said to be "lifted."

13.     The order book displays the total order volume at ten price levels on both the buy and sell sides of the market to all traders. The first-bid, or best-bid, level in the order book is the highest price at which someone is willing to buy. The first-offer, or best-offer, level in the order book is the lowest price at which someone is willing to sell. Globex functions such that all of the

orders at the best bid or best offer price level must be traded ("hit" or "lifted") before any orders at the next available best bid or offer price can be traded.

14.     Traders can view the aggregate number of contracts being bid or offered at each of the ten price levels on the buy or sell side of the market, but it is typically not possible for market participants to identify individual orders within the order book.  This combined bid and offer information is often referred to as the visible order book and represents the visible market depth.   Traders often consider information in the order book when making trading decisions.

15.     For the E-Mini S&P, Globex utilizes a "first in, first out" matching system for determining which orders within a given price level are matched, or executed against, another order.  This matching system places orders at the same price level in a queue, arranged from first received to last received, meaning orders later in the queue are less likely to result in executed trades.  During the Relevant Period, the Globex "first in, first out" matching system dictated that if the quantity of an order was increased (but not if it was decreased) that order would be moved to the back of the queue at that price level, as if it were an entirely new order.

**B.      At Trader A's Request, Thakkar and Edge Designed and Developed the Back-of-Book Function To Help Trader A Engage in Spoofing**

16.     Thakkar and Edge designed and developed the Back-of-Book function to exploit the Globex matching system and help Trader A place Spoof Orders in the E-mini S&P.  At Trader A's request, Thakkar and Edge designed the Back-of-Book function with two features. First, the Back-of-Book function, when enabled, automatically and continuously modified Trader A's order at a particular price level down and then up by one lot whenever a certain number of contracts were placed at the same price level after Trader A's Spoof Order entered the market. Each time the function automatically modified Trader A's order up by one lot, Trader A's order was moved by the Globex matching system to the back of the queue behind the orders of other

market participants at that price level, where Trader A's orders were less likely to be executed. Second, the Back-of-Book function, when enabled, immediately and automatically cancelled Trader A's order at a particular price level as soon as any portion of his order was hit or lifted by another market participant. These features of the Back-of-Book function enabled Trader A to place and leave large orders in the E-mini S&P at various price levels, including at or near the best bid or offer, that appeared to other market participants to be genuine orders, while minimizing the risk that these large orders would be hit or lifted before Trader A could cancel them. This allowed Trader A to send false signals of supply and demand for the E-mini S&P and induce other market participants to react to these false signals.

17.     Thakkar and Edge began designing and developing a custom trading software application for Trader A that included the Back-of-Book function in October 2011 after Trader A reached out to Thakkar for help. Beginning in October 2011, Thakkar and Trader A communicated by phone, emails, and web meetings to discuss Trader A's specific requirements for the application, including the Back-of-Book function. In these communications, Trader A was impressed by Thakkar's and Edge's experience with programming trading software applications.

18.     Beginning with an email on October 12, 2011 and in subsequent communications, Trader A asked Thakkar to design and develop within the custom trading software application several custom order types he could use to place orders to buy and sell the E-mini S&P. These order types included "Join" and "Join Side" orders. Trader A explained to Thakkar that the Join order type should automatically place either a bid or an offer order for the specified quantity whenever either the price level that had been the best offer became the best bid or the price level that had been the best bid became the best offer. As Trader A described to Thakkar "So if I

placed a 300 lot JOIN on the bid at 51 and it is trading 53-54. If either the 53 Bid or the 54 Offer is traded out then my 300 will appear at the same time at 51."

19.     Trader A explained to Thakkar that the Join Side order type should automatically place a bid if the price level that had been the best offer became the best bid, and automatically place an offer if the price level that had been the best bid became the best offer. As Trader A stated to Thakkar, "… in the above example the 300 lot will only join the 51 bid if the 54 offer is traded and the price goes 54 Bid."

20.     Trader A told Thakkar that for both the Join and Join Side order types he wanted the custom trading application to include a check box that when selected applied the Back-of-Book function to the Join and Join Side order types. Trader A told Thakkar that he wanted the Back-of-Book function to include two features. First, Trader A explained to Thakkar in the October 12, 2011, email that:

> "For both of the above order types we need to have the option to keep the order at the back of the book... we will have to make it that the order is increased by 1 every time an order greater than say 20 lots is placed. This value may be subject to change."

Trader A told Thakkar that he planned to use the Back-of-Book function to trade the E-mini S&P. Thakkar understood that under the Globex matching system for the E-mini S&P, increasing an order by one lot would move an order to the back of the queue at a particular price level in the E-Mini S&P order book. The Back-of-Book Spoof Order would not be hit or lifted until after all the visible orders ahead of the Back-of-Book Spoof Order at that price level were filled.

21.     Second, Trader A told Thakkar that if an order placed with the Back-of-Book function was hit or lifted by an order placed by another market participant, the Back-of-Book function would immediately and automatically cancel the remaining, unfilled portion of Trader

7

A's order before it could be hit or lifted by another order. Trader A specified to Thakkar in an email on November 4, 2011, that for orders placed with the Back-of-Book function, "[t]he order is deleted when the first clip is hit into it, whether that clip is a 1 lot or 100 lot."

22.     Trader A requested that Thakkar and Edge include this automatic cancellation feature to make it easier for him to cancel the Join and Join Side orders he placed with the Back-of-Book function, before any of these orders resulted in an executed trade. According to Trader A, he always intended to cancel any Join or Join Side order he placed with the Back-of-Book function enabled.

23.     Beginning in October 2011, Thakkar and Edge designed and developed the Back-of-Book function to include these two features. Thakkar directed Edge employees to begin work on the programming, and he oversaw their progress. In a document Thakkar emailed to Trader A on November 10, 2011, Thakkar explained his understanding of the features that Trader A had requested and told Trader A that that he and Edge were designing the custom trading software application to function exactly as described:

- "If "Back-of-Book" option is checked, based on the threshold qty (assume the default value 10 is used), the app will increase/decrease the order qty by 1 lot (after this … order is activated) every time new lots more than 10 (exclude 10) are placed on this order. Example: another 10+ qty order comes, change to 299, another 10+ qty order comes, change to 300. Keep changing between 299 or 300."

- "If and only if 'Back of the book' option is checked for this . . . order, upon partial fill event, unfilled qty will be deleted."

8

24. Thakkar provided the initial version of the custom trading software application to Trader A on November 16, 2011. Trader A responded that "[o]verall, I'm quite impressed and excited with it."

25. After November 16, 2011, Thakkar and Edge continued to further design and develop the custom trading software application to improve its operation and address problems raised by Trader A. Thakkar participated in several web meetings with Trader A in which Thakkar had the opportunity to observe Trader A's trading of the E-mini S&P and hear Trader A explain how he wanted the Back-of-Book function to operate.

26. Thakkar sent Trader A updated versions of the custom trading software application on December 14, 2011, and again on January 10, 2012. Between January and May of 2012, Thakkar, and other Edge programmers working at Thakkar's direction, continued to communicate with Trader A and make modifications to the operation of the application, including the Back-of-Book function.

27. Thakkar and Edge designed and developed the Back-of-Book function in order to help Trader A place Spoof Orders and inject false information regarding supply and demand for the E-mini S&P into the market. Throughout the design and development of the Back-of-Book function, Thakkar understood that Trader A intended to use the Back-of-Book function to place Spoof Orders. Thakkar knew that Trader A wanted orders placed with the Back-of-Book function always to remain behind other orders at a particular price level, minimizing the chance that Trader A's orders would result in executed trades. Based on Trader A's request that the Back-of-Book function immediately and automatically cancel any order placed with the Back-of-Book function as soon as any portion of that order was hit or lifted by an order from another market participant, Thakkar understood that Trader A intended to cancel these Back-of-Book

orders before they resulted in an executed trade.  Thakkar further understood that together, these two features of the Back-of-Book function would help Trader A send false signals of supply and demand for the E-mini S&P to other market participants by giving Trader A a way to place and leave large orders which appeared to other market participants to be genuine orders, but which Trader A intended to cancel before they resulted in executed trades.

28.     Based on his experience working with traders to design and develop trading software applications, Thakkar knew and understood that market participants consider information in the order book when making trading decisions.  Thakkar further knew and understood that market participants would react to the false signals communicated by the Spoof Orders Trader A intended to place with the Back-of-Book function and use that information in making trading decisions.  Thakkar and Edge designed and developed the Back-of-Book function to help Trader A accomplish his goal of tricking other market participants and luring them into making decisions and executing trades based on the false signals communicated by his Spoof Orders.

29.     Thakkar's understanding that Trader A intended to use the Back-of-Book function to place Spoof Orders is reflected in the contract between Edge and Trader A that Thakkar prepared and sent to Trader A on or around January 25, 2012.  In this contract, Thakkar summarized the various functions and features that Edge would program into the custom trading software application, including the Back-of-Book function.  In the contract, Thakkar noted that "he [Trader A] doesn't want to be hit on the join orders" placed with the Back-of-Book function. Trader A agreed to this contract and signed it electronically sometime on or around January 25, 2012.  Thakkar signed the contract on behalf of Edge.

10

30.     In his communications with Thakkar regarding his requirements for the custom trading software application, Trader A gave Thakkar examples of how he wanted the various functions, including the Back-of-Book function, to operate.  In those examples he gave to Thakkar, Trader A consistently referenced order sizes of approximately 300 contracts.  Thakkar understood that Trader A planned to use the Back-of-Book function to place orders of approximately 300 contracts in the E-mini S&P order book order that Trader A did not want to be hit or lifted on.

31.     Thakkar also understood that Trader A wanted to conceal the behavior of the orders that he placed with the Back-of-Book function from other traders in the market.  Trader A asked Thakkar to design the Back-of-Book function so that it did not move Trader A's order to the back of the queue every time another market participant placed an order at that price level, but only when the new order exceeded a certain minimum quantity.  Trader A told Thakkar that increasing and decreasing the size of his order by one lot every time a new order was placed "started to look a little strange with 1 lots changing all the time, so we will have to make it that the order is increased by 1 every time an order greater than say 20 lots is placed.  This value may be subject to change."

32.     Thakkar recognized that the custom trading software application he designed and developed for Trader A, including the Back-of-Book function, was a powerful tool containing functions and features that would be useful and valuable for other traders.  As a result, Thakkar sought to capitalize on it.  Thakkar and Edge initially offered to design and develop the application "for a fixed price of $12,500 for the projects, with rights to resell the app.  This is sort of below cost for us, but we would do it in hopes to make money by selling it to other customers."  Thakkar later increased the price of the application to $24,200 in the January 25,

11

2012 contract between Trader A and Edge, which incorporated additional specifications from Trader A, but reserved in that contract "all rights to modify, use or sell any code, or derivative work in any form."

33. During the time when Thakkar and Edge designed and developed the Back-of-Book function for Trader A, Thakkar was knowledgeable regarding the various strategies used by high frequency and algorithmic traders. Thakkar was also familiar with how these trading strategies could affect and did affect trading in futures markets, including the potential for certain trading strategies to cause disruptions to orderly trading in futures markets. During the time when Thakkar and Edge designed and developed the Back-of-Book function for Trader A, Thakkar understood and was familiar with the practice of spoofing. Beginning in March 2012, Thakkar participated in the CFTC's Technology Advisory Committee's Subcommittee on High Frequency Trading. The Subcommittee on High Frequency Trading was formed to analyze and develop recommendations regarding the definition of high frequency trading in the context of the larger universe of automated trading. In this capacity, Thakkar participated in a working group consisting of representatives from a variety of firms in the trading industry, as well as CFTC staff. One of the topics addressed by the working group in which Thakkar participated was trading practices and strategies that used high frequency trading techniques, including spoofing.

### C. Trader A Used the Back-of-Book Function To Engage in Spoofing

34. Trader A used the Back-of-Book function developed by Thakkar and Edge to place Spoof Orders at various price levels of the visible order book for the E-mini S&P, including at the best bid or the best offer. Trader A used the Back-of-Book function to place Spoof Orders in the visible E-mini S&P order book, where they appeared to be genuine orders and tricked other traders into thinking that Trader A actually wanted to buy or sell the number of

contracts specified in these Spoof Orders. Trader A intended to cancel these Spoof Orders before they resulted in executed trades.

35.     By placing these Spoof Orders with the Back-of-Book function, Trader A minimized the chance that these Spoof Orders would be hit or lifted by other market participants and was able to automatically cancel these Spoof Orders before they resulted in executed trades. The purpose of the Spoof Orders Trader A placed with the Back-of-Book function was to place large orders in the visible E-mini S&P order book to affect prices, but minimize the chances that such orders would result in executed trades. The Back-of-Book function helped Trader A inject false information into the market regarding supply and/or demand for the E-mini S&P and lure other market participants into reacting to this false information. Trader A was thus able to trick other market participants into executing against orders he placed on the opposite side of the market—allowing Trader A to profit, mitigate potential losses, and/or liquidate positions at more favorable prices than were otherwise available without the use of the Back-of-Book Program.

36.     Trader A used the Back-of-Book function to engage in spoofing in the E-mini contract between at least January 30, 2013 and October 30, 2013.

37.     For example, on February 22, 2013, at approximately 10:17:07 CST, Trader A placed a 722-lot Back-of-Book Spoof Order to buy at 150400 in the March13 E-mini S&P contract (the 150400 Spoof Order). The 150400 Spoof Order was at the third-best bid and joined 2,034 other lots at that level. The Back-of-Book function designed and developed by Thakkar and Edge automatically modified this order, switching between 722 and 723 lots a total of 25 times and returning to the end of the queue of outstanding buy orders on the CME at 150400 each time it increased its volume by one lot. As a result, this Back-of-Book Spoof Order remained on the market, unexecuted, for nearly two minutes. By the time Trader A canceled the

order, the 150400 Spoof Order was at the best bid and made up nearly forty percent of total order quantity at that price level. While the 150400 Spoof Order was on the market, Trader A placed a 376-lot sell order at the price of 150450 and was filled.

38.     In another instance, on February 25, 2013, at approximately 12:48:52 CST, Trader A used the Back-of-Book function to place three 796-lot Spoof Orders to sell the March13 E-mini S&P contract. These Back-of-Book Spoof Orders were placed at prices of 150450 (150450 Spoof Order), 150475 (150475 Spoof Order), and 150500 (150500 Spoof Order). At the time Trader A placed these orders, the 150450 Spoof Order was at the best offer, or level 1 of the order book and comprised 49 percent of the 1,634 total lots in the order book at that level. The 150475 Spoof Order was placed at the third best offer, or level 3 of the order book, and comprised 34 percent of the 2,357 total lots in the order book at that level. The 150500 spoof order was placed at the fourth best offer, or level 4 of the order book, and comprised 39 percent of the 2,043 total lots in the order book at that level. Over the next several seconds, the Back-of-Book function designed and developed by Thakkar and Edge automatically modified each of these orders. Specifically, the 150450 Spoof Order was modified 13 times, flipping back and forth between 796 and 797 lots, ensuring that it remained behind other offers in the queue and stayed on the market, unexecuted, for approximately 12 seconds, until Trader A cancelled the order. The 150475 Spoof Order was modified 10 times, flipping back and forth between 796 and 797 lots, ensuring that it remained behind other offers in the queue and stayed on the market, unexecuted, for approximately 24 seconds, until Trader A cancelled the order (after that price level had become the best offer on the market). The 150500 Spoof Order was modified 14 times, again flipping back and forth between 796 and 797 lots, ensuring that it remained behind other offers in the queue and stayed on the market, unexecuted, for

approximately 46 seconds, until Trader A canceled the order (after that price level had also become the best offer on the market). In the same millisecond that Trader A canceled the 150450 Spoof Order, he placed and was completely filled on a 796-lot order to buy at the same price level.

39. The following table summarizes Trader A's spoofing activity using the Back-of-Book function on February 25, 2013, at approximately 12:48:52 CST:

| Price level | Time of entry | Market level at time of entry | Spoof Order Percentage of Market | Times Order Modified | Time before Cancelation (in seconds) | Market Level at cancelation |
|---|---|---|---|---|---|---|
| 150450 | 12:48:52.156 | 1 [Best offer] | 49% | 13 | 12.311 | 1 [Best offer] |
| 150475 | 12:48:52.355 | 3 | 39% | 10 | 24.119 | 1 [Best offer] |
| 150500 | 12:48:52.355 | 4 | 34% | 14 | 46.033 | 1 [Best offer] |

**D.    Thakkar and Edge Continued To Support Trader A's Custom Trading Software Application Through 2015**

40. Edge and Thakkar continued to develop, troubleshoot, and improve the custom trading software application and communicate with Trader A in 2012 and 2013. During this time, Trader A continued to communicate with Thakkar regarding his use of the Back-of-Book function to place orders in the E-mini S&P that he intended to cancel before they resulted in executed trades. For example, on October 24, 2012, Trader A complained to Thakkar that automatic cancellation feature of the Back-of-Book function was not working properly: "1st click cancel doesn't work on Join/Join Side – I have been hit numerous clips and the order doesn't pull." Thakkar agreed to perform additional programming work for Trader A to ensure that this feature was operating as Trader A wanted. Thakkar himself tested the automatic

15

cancellation feature of the Back-of-Book function and told Trader A on November 19, 2012, that he could not reproduce the issues Trader A had encountered.

41.     After February 2013, Thakkar and Edge remained available to help Trader A with the operation and further development of the custom trading software application.  In December 2014, Trader A told Thakkar that he had taken a six-month break from trading but now needed help from Thakkar and Edge because the application had stopped working.   At this time, Trader A sought help from Thakkar and Edge to restore all the functions of the application, including the Back-of-Book function.  Thakkar and Edge agreed to continue to design and develop the application to restore Trader A's ability to use it, including the Back-of-Book function.  In December 2014, Thakkar sent Trader A a new version of the application again that Thakkar believed fixed the problem identified by Trader A.  Trader A responded that it still did not work and that he was "getting screwed here without the app."

42.     After receiving the new version of the custom trading software application from Thakkar on December 14, 2014, Trader A continued to communicate to Thakkar his urgent request for further design and development of the application, at one point saying "I really need a working version for this morning trading in the US, am used to having the app available and it is costing me not having it in these volatile markets."  Thakkar and Edge concluded that the problems Trader A was encountering resulted from an incompatibility between the original version of the application designed by Thakkar and Edge and subsequent updates to the trading platform software Trader A used to access the Globex trading platform.  Thakkar informed Trader A that further developing the application so that Trader A could use it with the new version of his trading platform software would require additional programming by Edge employees.

43.     At Trader A's request, Thakkar and Edge further designed and developed the custom trading software application in December 2014 and January 2015 in order to provide Trader A with working version of the application.  Thakkar sent Trader A new versions of the application on at least December 16, 2014 and January 5, 6, 9, and 15 of 2015.  Trader A continued to make additional requests to Thakkar and Edge for further modifications to the application, emailing Thakkar after receiving another new version of the application on January 15, 2015, that "I really can't afford to be without the app when its [sic] this volatile."  Shortly thereafter, upon information and belief, Thakkar sent the application again.

44.     On or around March 30, 2015, Thakkar and Edge billed Trader A approximately $4,000 dollars for approximately 35.5 hours of additional design and development work by Thakkar and Edge in December 2014 and January 2015.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Aiding and Abetting Violations of Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C)**

**Spoofing**

45.     The allegations set forth in Paragraphs 1 through 44 are re-alleged and incorporated herein by reference.

46.     Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), makes it unlawful "for any person to engage in trading, practice, or conduct on or subject to the rules of a registered entity that – (C) is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)."

47.     Trader A has admitted that he violated Section 4c(a)(5)(C) of the Act at least between January 30, 2013, and October 30, 2013.

17

48.     By reason of the conduct described above, Edge and Thakkar willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of Section 4c(a)(5)(C) of the Act committed by Trader A or acted in combination or concert with Trader A in such violations.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012), Edge and Thakkar are therefore responsible as if they were principals for Trader A's violations of Section 4c(a)(5)(C) of the Act from January 30, 2013, through October 30, 2013.

49.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), provides that the act, omission, or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed an act of the corporation.  Because the actions of Thakkar and the actions of other Edge employees who helped design and develop the Back-of-Book function at Thakkar's direction were within the scope of their employment with Edge, Edge is liable for their acts constituting violations of the Act pursuant to Section 2(a)(1)(B) of the Act.

50.     Thakkar controlled Edge, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of Edge that constitute violations alleged in this alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Thakkar is liable as a controlling person for the violations by Edge of Section 4c(a)(5)(C).

51.     Each and every instance between January 30, 2013, and October 30, 2013, that Trader A placed Spoof Orders for the E-mini S&P using the Back-of-Book function constitutes a separate and distinct violation of Section 4c(a)(5)(C) of the Act for which Thakkar and Edge are responsible as if they were principals under Section 13(a) of the Act.

## COUNT II

**Aiding and Abetting Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3)**

**Use of a Manipulative and Deceptive Device, Scheme, or Artifice To Defraud**

52.     The allegations set forth in Paragraphs 1 through 51 are re-alleged and incorporated herein by reference.

53.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017), make it unlawful, in connection with a contract for future delivery on a registered entity, to intentionally or recklessly:  (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; or, (2) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

54.     Trader A has admitted that he violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3) at least between January 30, 2013, and October 30, 2013.

55.     By reason of the conduct described above, Thakkar and Edge willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3) committed by Trader A or acted in combination or concert with Trader A.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Edge and Thakkar are therefore responsible as if they were principals for Trader A's violations of Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3) from January 30, 2013, through October 30, 2013.

56.     Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B) (2012), provides that the act, omission, or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed an act of the corporation.  Because the actions of

Thakkar and the actions of other Edge employees who helped design and develop the Back-of-Book function at Thakkar's direction were within the scope of their employment with Edge, Edge is liable for their acts constituting violations of the Act pursuant to Section 2(a)(1)(B) of the Act..

57.     Thakkar controlled Edge, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of Edge that constitute violations alleged in this alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Thakkar is liable as a controlling person for the violations by Edge of Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3).

58.     Each and every instance between January 30, 2013, and October 30, 2013, that Trader A placed Spoof Orders for the E-mini S&P using the Back-of-Book function constitutes a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3) for which Thakkar and Edge are responsible as if they were principals under Section 13(a) of the Act.

## VI.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.     Find Thakkar and Edge responsible as if they were principals pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a) (2012), for violating Sections 4c(a)(5)(C) and 6(c)(1) and (3) of the Act,  7 U.S.C. §§ 6c(a)(5)(C), 9(1), (3) (2012); and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017);

B.     Enter an order of permanent injunction enjoining Thakkar, Edge, and all of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all

persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3);

C.  Enter an order of permanent injunction restraining and enjoining Thakkar, Edge, and all of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1.  Selling the custom trading application Thakkar and Edge developed for Trader A or any application derived from the source code for that custom trading application;

2.  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

3.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for their own personal account or for any account in which either Thakkar or edge has a direct or indirect interest;

4.  Having any commodity interests traded on their behalf;

5.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

6.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

7.  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017);

8.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

9.  Directly or indirectly engaging in, controlling, directing, or providing any services relating to computer programming for any person or entity for the purpose of trading on or subject to the rules of any registered entity (as

21

that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012) or entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy)).

D.     Enter an order directing Thakkar and Edge to pay civil monetary penalties, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act, as described herein;

E.     Enter an order providing for such other and further remedial and ancillary relief, including but not limited to disgorgement, as this Court may deem necessary and appropriate; and,

F.     Enter an order requiring Thakkar and Edge to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012).

Dated:     January 28, 2018            Respectfully submitted,

PLAINTIFF COMMODITY FUTURES
TRADING COMMISSION

**/s/Thomas L. Simek**
Chief Trial Attorney

Thomas L. Simek (DC Bar #57268)
Margaret P. Aisenbrey (MO Bar #59560)
Commodity Futures Trading Commission
4900 Main Street, Ste. 500
Kansas City, Missouri 64112
Telephone: (816) 960-7700
Facsimile: (816) 960-7751
tsimek@cftc.gov
maisenbrey@cftc.gov

Attorneys for Plaintiff