IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EDGE FINANCIAL TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. 1:18-cv-00619 |

### CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT EDGE FINANCIAL TECHNOLOGIES, INC.

#### I.   INTRODUCTION

On January 28, 2018, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendant Edge Financial Technologies, Inc. ("Edge") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1–26 (2018), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1-190 (2019).

#### II.   CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendant Edge without a trial on the merits or any further judicial proceedings, Defendant Edge:

1. Consents to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendant Edge ("Consent Order");

2. Affirms that it has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission

or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3. Acknowledges service of the summons and Complaint;

4. Admits the jurisdiction of this Court over it and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018);

5. Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6. Admits that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7. Waives:

   a. Any and all claims that it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018) and 28 U.S.C. § 2412 (2018), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this action;

   b. Any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

   c. Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

   d. Any and all rights of appeal from this action;

8. Consents to the continued jurisdiction of this Court over it for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other

purpose relevant to this action, even if Edge now or in the future resides outside the jurisdiction of this Court;

9. Agrees that it will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

10. Agrees that neither it nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect its: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party. Edge shall comply with this agreement, and shall undertake all steps necessary to ensure that all of its agents and/or employees under its authority or control understand and comply with this agreement;

11. Consents to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, which it admits;

12. Consents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

13. Does not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to

which the Commission is a party, other than a: statutory disqualification proceeding; proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Order;

14. Agrees to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 47 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against it, whether inside or outside the United States; and

15. Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendant Edge in any other proceeding.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), as set forth herein. The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A. Findings of Fact**

**1. The Parties to this Consent Order**

16. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

17. Defendant **Edge Financial Technologies, Inc.** is an Illinois corporation founded in 2007. Edge employed up to four software developers who provided computer programming

services for creating electronic trading software and tools. Edge has never been registered with the CFTC.

### 2. The E-mini S&P Market

18. The E-mini S&P 500 futures contract ("E-mini S&P) is listed and traded on the Chicago Mercantile Exchange, Inc. ("CME"), a registered entity. Trading in the E-mini S&P is conducted electronically via Globex. On Globex, traders have the ability to enter, modify, and cancel orders in a matter of milliseconds through a computer portal that accesses the Globex platform.

19. An "order," in the context of electronic exchange trading, is a request submitted to an exchange to buy ("bid") or sell ("offer" or "ask") a certain number of a specified futures contract. When an order to "buy" or "sell" futures contracts at a specific price is placed on Globex, the order becomes part of the exchange's order book. When one or more contracts in an order are bought or sold, the result is an executed trade. Orders that result in executed trades are said to be "hit," "lifted," or "filled."

20. The order book displays the total order volume for each of the ten best price levels on both the buy and sell sides of the market to all traders. The first-bid, or best-bid, level in the order book is the highest price at which someone is willing to buy. The first-offer, or best-offer, level in the order book is the lowest price at which someone is willing to sell. Globex functions such that all of the orders at the best bid or best offer price level must be traded before any orders at the next available best bid or offer price can be traded.

21. Traders can view the aggregate number of contracts being bid or offered at each of the ten best price levels on the buy and sell side of the market, but it is typically not possible for market participants to identify individual orders within the order book. This combined bid

and offer information is often referred to as the visible order book and represents the visible market depth. Traders often consider information in the order book when making trading decisions.

22. For the E-Mini S&P, Globex utilizes a "first in, first out" matching system for determining which orders within a given price level are matched, or executed against, another order. This matching system places orders at the same price level in a queue, arranged from first received to last received, meaning orders later in the queue are less likely to result in executed trades. During the Relevant Period, the Globex "first in, first out" matching system dictated that if the quantity of an order was increased (but not if it was decreased) that order would be moved to the back of the queue at that price level, as if it were an entirely new order.

### 3. Edge Programmed a Custom Software Application that Included a Back-of-Book Function that Trader A Used To Engage in Spoofing and Employ a Manipulative and Deceptive Device, Scheme, or Artifice To Defraud

23. At Trader A's request, Edge programmed a custom software application for Trader A that included custom order types and other features programmed according to Trader A's specifications. These features included a "Back-of-Book" function with two elements. First, the Back-of-Book function, when enabled, automatically and continuously modified Trader A's order at a particular price level down and then up by one lot whenever a certain number of contracts were placed at the same price level after Trader A's order entered the market. Each time the Back-of-Book function automatically modified Trader A's order up by one lot, the Globex "first in, first out" matching system moved Trader A's order to the back of the queue behind the orders of other market participants at that price level, where Trader A's orders were less likely to be filled. Second, the Back-of-Book function, when enabled, immediately and

automatically cancelled Trader A's order at a particular price level as soon as any portion of his order was filled by another market participant.

24.     Trader A used the Back-of-Book function in the custom software application programmed by Edge both to engage in "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution) and in the course of employing a manipulative and deceptive scheme involving the E-mini S&P from at least January 30, 2013, through October 30, 2013.

25.     Trader A used the Back-of-Book function to engage in spoofing by placing and leaving large orders for the E-mini S&P at multiple price levels of the visible order book that Trader A intended to cancel before they resulted in executed trades ("Spoof Orders"). The Back-of-Book function helped Trader A place these Spoof Orders by minimizing the chance that these Spoof Orders would result in executed trades before Trader A could cancel them. Using the Back-of-Book function, Trader A placed large Spoof Orders at or near the best bid or offer, where they were more likely to appear to other market participants to be genuine orders.

26.     By placing Spoof Orders at various price levels of the visible E-mini S&P order book, including at or near the best bid or offer, while minimizing the risk that these Spoof Orders would be filled, the Back-of-Book function allowed Trader A to send false signals of supply and demand for the E-mini S&P and induce other market participants to react to these false signals. Using the Back-of-Book function, Trader A was thus able to trick other market participants into executing against orders he placed on the opposite side of the market—allowing Trader A to profit, mitigate potential losses, and/or liquidate positions at more favorable prices than were otherwise available without the use of the Back-of-Book Program.

### 4. Edge Programmed the Back-of-Book Function in the Custom Software Application It Developed for Trader A Knowing That Trader A Planned To Use This Function To Engage in Spoofing and Employ a Manipulative and Deceptive Device, Scheme, or Artifice To Defraud

27. Edge programmed the Back-of-Book function for Trader A knowing that Trader A planned to use the Back-of-Book function to engage in spoofing and to employ a manipulative and deceptive scheme to inject false information into the market about supply and demand for the E-mini S&P.

28. Edge employees participated in extensive email correspondence, multiple phone calls, and several web meetings with Trader A in which they discussed with Trader A the specifications and operation of the Back-of-Book function. During at least one web meeting, Edge employees observed Trader A place orders for the E-mini S&P in a simulation environment and heard Trader A explain how he wanted the custom software application to place and cancel orders in response to changing market prices. The written statement of work, in which Edge employees memorialized Trader A's specifications for the Back-of-Book function, expressly states that "he [Trader A] doesn't want to be hit on the join orders" placed with the Back-of-Book function.

29. Edge knew that Trader A wanted orders placed with the Back-of-Book function always to remain behind other orders at a particular price level, minimizing the chance that Trader A's orders would result in executed trades. Edge further knew that Trader A wanted any order placed with the Back-of-Book function to be cancelled immediately and automatically as soon as any portion of that order was filled by an order from another market participant. Edge understood that together these two features of the Back-of-Book function would help Trader A place and leave large orders that Trader A intended to cancel before they resulted in executed trades.

30. Based on its experience working with traders to develop trading software applications, Edge knew and understood that market participants consider information in the order book when making trading decisions. Edge further knew or should have known and understood that market participants would react to the false signals communicated by the Spoof Orders Trader A intended to place with the Back-of-Book function and would use that information in making trading decisions. Edge programmed the Back-of-Book function to help Trader A accomplish his goal of tricking other market participants and luring them into making decisions and executing trades based on the false signals communicated by his Spoof Orders.

## B. Conclusions of Law

### Jurisdiction and Venue

31. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), provides that the Commission may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

32. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Edge resides in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

### Count I: Aiding and Abetting Violations of Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C)

### Spoofing

33. By the conduct described in Paragraphs 1 through 32 above, Trader A committed spoofing in violation of Section 4c(a)(5)(C) of the Act, 7 U.S.C § 6c(a)(5)(C) (2018).

34. By the conduct described in Paragraphs 1 through 32 above, Defendant Edge willfully aided, abetted, counseled, and worked in combination and in concert with Trader A in Trader A's wrongful conduct. Therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2018), Edge is liable for Trader A's violations of Section 4c(a)(5)(C) of the Act, 7 U.S.C § 6c(a)(5)(C).

### Count II: Aiding and Abetting Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3)

### Use of a Manipulative and Deceptive Device, Scheme, or Artifice To Defraud

35. By the conduct described in Paragraphs 1 through 32, Trader A violated of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2019).

36. By the conduct described in Paragraphs 1 through 32 above, Defendant Edge willfully aided, abetted, counseled, and worked in combination and in concert with Trader A in Trader A's wrongful conduct. Therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Edge is liable for Trader A's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1), (3).

37. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Edge will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV. PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

38. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), Defendant Edge is permanently restrained, enjoined and prohibited from directly or indirectly:

   a. Spoofing in violation of Section 4c(a)(5)(C) of the Act, 7 U.S.C. §§ 6c(a)(5)(C) (2018);

   b. Using a manipulative and deceptive device, scheme, or artifice to defraud in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018); and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2019);

39. Defendant Edge, including its agents, employees, successors, assigns, and all persons in active concert with it, is permanently restrained, enjoined, and prohibited from directly or indirectly:

   a. Selling the custom software application Edge developed for Trader A, or any application that includes the Back-of-Book function developed as part of that custom software application;

   b. Possessing the custom software application Edge developed for Trader A, including the source code for that custom software application, or any application that includes the Back-of-Book function developed as part of that custom software application;

40. Defendant Edge, including any agents, employees, successors, assigns acting on Edge's behalf, and all persons in active concert with it, is restrained, enjoined, and prohibited for a period of two years from directly or indirectly:

    a.    Engaging in, controlling, directing, or providing any services relating to computer programming for any person or entity for the purpose of trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018), or entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019); and/or

    b.    Soliciting, receiving, or accepting any funds from any person for the purpose of engaging in, controlling, directing, or providing any services relating to computer programming for any person or entity for the purpose of trading on or subject to the rules of any registered entity, as that term is defined in 7 U.S.C. § 1a(40) (2018) or entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3).

41.    Notwithstanding any provision in this Consent Order to the contrary, nothing herein shall enjoin, limit, or restrict Edge from selling or transferring any assets it owns including, but not limited to, any software and intellectual property (specifically excluding the custom software application developed for Trader A or any software that includes the Back-of-Book function developed as part of that custom software application) to a third party as part of a wind down of Edge's business operations.

## V.    DISGORGEMENT AND CIVIL MONETARY PENALTY

### A. Disgorgement

42.    Defendant Edge shall pay disgorgement in the amount of twenty-four thousand and two hundred dollars ($24,200) ("Disgorgement Obligation"), representing the gains received in connection with such violations within thirty days of the date of entry of this Consent Order.

If the Disgorgement Obligation is not paid in full within thirty days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2018).

43.   Defendant Edge shall pay its Disgorgement Obligation and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendant Edge shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendant Edge shall accompany payment of the Disgorgement Obligation with a cover letter that identifies Defendant Edge and the name and docket number of this proceeding. Defendant Edge shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**B. Civil Monetary Penalty**

44.     Defendant Edge shall pay a civil monetary penalty in the amount of forty-eight thousand and four hundred dollars $48,400 ("CMP Obligation"), within thirty days of the date of entry of this Consent Order. If the CMP Obligation is not paid in full within thirty days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2018).

45.     Defendant Edge shall pay its CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

46.     If payment by electronic funds transfer is chosen, Defendant Edge shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendant Edge shall accompany payment of the CMP Obligation with a cover letter that identifies Defendant Edge and the name and docket number of this proceeding. Defendant Edge shall simultaneously transmit copies of the cover letter and the

form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

### C. Provisions Related to Monetary Sanctions

47. **Partial Satisfaction:** Acceptance by the Commission of any partial payment of Defendant Edge's Disgorgement Obligation or CMP Obligation shall not be deemed a waiver of its obligation to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI. MISCELLANEOUS PROVISIONS

48. **Notice:** All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Charles D. Marvine
> Deputy Director
> 4900 Main Street, Suite 500
> Kansas City, MO 64113

Notice to Defendant

> Renato Mariotti
> Thompson Coburn LLP
> 55 E. Monroe Street
> 37th Floor
> Chicago, IL 60603

All such notices to the Commission shall reference the name and docket number of this action.

49. **Change of Address/Phone:** Until such time as Defendant Edge satisfy in full its Disgorgement Obligation and CMP Obligation as set forth in this Consent Order, Defendant Edge shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

50. **Entire Agreement and Amendments:** This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

51. **Invalidation:** If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

52. **Waiver:** The failure of any party to this Consent Order at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

53. **Continuing Jurisdiction of this Court:** This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendant Edge to modify or for relief from the terms of this Consent Order.

54. **Injunctive and Equitable Relief Provisions:** The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendant Edge, upon any person under its authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendant Edge.

55. Authority: The undersigned hereby warrants that he is President of Defendant Edge, and that this Consent Order has been duly authorized by Defendant Edge and he has been duly empowered to sign and submit this Consent Order on behalf of Defendant Edge.

56. Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

57. Contempt: Defendant Edge understands that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings it may not challenge the validity of this Consent Order.

58. Agreements and Undertakings: Defendant Edge shall comply with all of the undertakings and agreements set forth in this Consent Order.

59. There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty, and other Equitable Relief Against Defendant Edge Financial Technologies, Inc.* forthwith and without further notice.

IT IS SO ORDERED on this 14th day of September, 2020.

*[signature]*

**UNITED STATES DISTRICT JUDGE**

CONSENTED TO AND APPROVED BY:



Jitesh Thakkar, on behalf of Defendant Edge Financial Technologies, Inc.

Date: 06/24/2020

Thomas L. Simek
Chief Trial Attorney
Commodity Futures Trading Commission
4900 Main Street
Suite 500
Kansas City, MO 64112

Date _____

Approved as to form:



Renato Mariotti
Thompson Coburn LLP
55 E. Monroe Street
37th Floor
Chicago, IL 60603
Attorney for Defendant Edge Financial Technologies, Inc.

Date: June 25, 2020

CONSENTED TO AND APPROVED BY:

|  |  |
|---|---|
| _____ <br> Jitesh Thakkar, on behalf of Defendant Edge Financial Technologies, Inc. <br><br> Date: _____ | **/s/Thomas L. Simek** <br><br> Thomas L. Simek <br> Chief Trial Attorney <br> Commodity Futures Trading Commission <br> 4900 Main Street <br> Suite 500 <br> Kansas City, MO 64112 <br><br> Date: <u>August 12, 2020</u> |

Approved as to form:

_____

Renato Mariotti
Thompson Coburn LLP
55 E. Monroe Street
37th Floor
Chicago, IL 60603
Attorney for Defendant Edge Financial Technologies, Inc.

Date: _____

18